**SO ORDERED: March 27, 2008.**



**James K. Coachys**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN RE:                                   )
                                         )
JOEL ANTHONY TURNER,                     )        Case No. 07-06592-JKC-13
                                         )
        Debtor.                          )

### ORDER OVERRULING TRUSTEE'S OBJECTION TO CONFIRMATION

This matter came before the Court on the Chapter 13 Trustee's (the "Trustee") Objection to

Confirmation (the "Objection"), wherein the Trustee argues that the Debtor's Chapter 13 plan should

not be confirmed because it does not meet the "disposable income" or "good faith" tests of 11 U.S.C.

§ 1325.[1]  For the reasons stated below, the Court overrules the Objection.[2]

---

[1]  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  This is a core
proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

[2]  The Court notes that Debtor did not file a brief until well after the deadline established by the
Court, without leave to do so.  Because the brief played no part in the Court's decision, the Court chooses
not to strike it, as requested by the Trustee.

## A.  Facts

Debtor sought Chapter 13 bankruptcy protection on July 17, 2007.  Along with his petition, Debtor submitted Official Form B22C, Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income ("Form B22C") and a proposed plan (the "Plan").  Per Form B22C, Debtor has "current monthly income" of $5,453.00.  His annual income of $65,436.00 is well above the average median income for a household of one in Indiana.  Factoring in his expenses, Form B22C indicates that he has a deficit of $94.60 in monthly "disposable income." Debtor's calculation includes a monthly mortgage payment, listed on Subpart C of B22C, of $1,521.00 for his residence.  According to his Plan, however, Debtor intends to surrender his residence.  Thus, neither the Plan nor Schedule J includes payments for any mortgage, mortgage arrearage or property taxes.  Instead, Schedule J lists $950.00 in estimated monthly rent and net income of $250.00 per month, which is also the amount that Debtor proposes to devote to the Plan for a period of 60 months.

## B.  Discussion and Decision

### 1.  Disposable Income

Prior to the amendments made to the Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), § 1325(b)(1) provided:

> If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan–
> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount or such claim; or
> (B) the plan provides that all of debtor's projected disposable income to be received in the three year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

11 U.S.C. § 1325(b)(1) (2004).  Section 1325(b)(2), in turn, defined disposable income as "income

2

received by the debtor and which [was] not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor. . . ." Pursuant to that definition, both the income and expense components of disposable income were determined primarily by reference to the amounts listed by the debtor on Schedules I and J. 11 U.S.C. § 1325(b)(2) (2004).

BAPCPA amended § 1325(b)(1)(B) to prohibit the court from approving a proposed Chapter 13 plan over the objection of the trustee or an unsecured creditor unless the proposed plan commits all of a debtor's "projected disposable income to be received in the applicable commitment period" to the payment of unsecured creditors. 11 U.S.C. § 1325(b)(1)(B). BAPCPA also amended the definition of "projected disposable income." Section 1325(b)(2) now provides that for purposes of subsection (b), disposable income "means current monthly income received by the debtor less amounts reasonably necessary to be expended . . . ." 11 U.S.C. § 1325(b)(2). "Current monthly income," in turn, is defined as the debtor's average monthly income received during the six calendar months *prior* to filing. 11 U.S.C. § 101(10A) (italics added).

Significant to the case at hand, BAPCPA further amended § 1325(b) by adding a provision stating that the "amounts reasonably necessary to be expended" for above median income debtors is to be calculated in accordance with subparagraphs (A) and (B) of § 707(b)(2). 11 U.S.C. § 1325(b)(3). In contrast, the expense component for below median income debtors is determined– as it was prior to BAPCPA–by reference to the figures provided by Schedules I and J. *See In re Miller*, 361 B.R. 224, 228 n.7 (Bankr.N.D.Ala.2007) (citing *In re Dew*, 344 B.R. 655 (Bankr.N.D.Ala.2006) and *In re Alexander*, 344, B.R. 742 (Bankr.E.D.N.C.2006)). Pursuant to Section 707(b), which is commonly referred to as the "means test," a debtor is permitted to deduct certain standardized and actual expenses to calculate "disposable income." 11 U.S.C. §

3

707(b)(2)(A)(ii)(I).

Under the means test, debtors may subtract "the total of all amounts scheduled as contractually due to secured creditors each month of the 60 months following the date of the petition." 11 U.S.C. § 707(b)(2)(A)(iii)(I). Because Debtor intends to surrender his residence, however, the question before the Court is whether he properly included his mortgage payment in calculating his disposable income or whether he should be compelled to exclude such payment, thereby increasing the amount of disposable income he must commit to pay unsecured creditors under the Plan.

To answer that question, the Court must construe and apply the Code provisions outlined above. It is well established that "when the statute's language is plain, the sole function of the courts–at least where the disposition required by the text is not absurd–is to enforce it according to its terms." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (internal quotation marks omitted) (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290) (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). A court may look beyond the plain meaning of a statute when the "result it apparently decrees is difficult to fathom or where it seems inconsistent with Congress' intention." *Public Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 454-55, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377 (1989); *see also United States v. Ritsema,* 31 F.3d 559, 566-67 (7th Cir.1994). However, a court's "task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, 'that language must ordinarily be regarded as conclusive.'" *Griffin v. Oceanic Contractors, Inc*., 458 U.S. 564, 570, 102 S.C. 3245, 3250, 73 L.E.2d 973 (1982) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc*., 447

4

U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).

Bankruptcy courts have reached conflicting conclusions as to the "plain meaning" of §

707(b)(2)(A)(iii). *Compare In re Skaggs,* 349 B.R. 594 (Bankr.E.D.Mo.2006) *with In re Nockerts*,

357 B.R. 497 (Bankr.E.D.Wis.2006). In *Skaggs*, the court did not use the common dictionary

definition of "scheduled as" but instead construed the phrase to mean those debts listed on the

debtor's bankruptcy schedules and statement of intent. *Skaggs*, 349 B.R. at 590. The court

explained:

> Congress used the phrase "scheduled as" several times in the Bankruptcy Code to
> refer not to the common dictionary definition meaning for the word schedule (i.e.,
> "to plan for a certain date"), but to whether a debt is identified on a debtor's
> bankruptcy schedules. See 11 U.S.C. § 1111(a) wherein a claim or interest is not
> deemed filed if it is scheduled as disputed, contingent, or unliquidated. When
> Congress amends a law, as it did with BAPCPA, the prior statute's " . . .
> longstanding meaning forms the background against which Congress legislates . . .
> The courts presume that Congress will use clear language if it intends to alter an
> established understanding about what a law means; if Congress fails to do so, courts
> presume that the new statute has the same effect as the other version." Nothing in
> 11 U.S.C. § 707(b)(2)(A)(iii) indicates an intent to assign a different meaning to the
> phrase "scheduled as" in this provision and to do so would run contrary to the statute.
>       Accordingly, the Debtors' schedules and statements form the basis from
> which the Court should determine whether a debt is "scheduled as contractually
> due." 11 U.S.C. § 521, in conjunction with Federal Rule of Bankruptcy Procedure
> 1007(b), requires debtors to file, inter alia, schedules and a statement of intent as
> prescribed on the appropriate official forms. Further, debtors have a duty to amend
> their schedules and statements "to keep the information in them current."

*Id*. at 599 (citations omitted).

The court in *Nockerts* disagreed with the above reasoning. Engaging in its own examination

of the Code's use of "scheduled" and "scheduled as," the court noted that "[w]hen describing the

bankruptcy schedules, Congress included in the statute a reference to the schedules, either directly

by name or indirectly by reference to § 521, the provision that requires the debtor to file bankruptcy

schedules." *Nockerts*, 357 B.R. at 503. Emphasizing that Section 707(b)(2)(A)(iii) does not refer

to § 521, the court concluded that the phrase "scheduled as" was intended to have its common, dictionary definition. *Id*. As such, to be included in the disposable income calculation, a secured payment must merely be due under the contract, i.e., a promissory note, on a specific date for each of the sixty months following the filing of the petition.

The Court finds *Nockerts* to be more persuasive than *Skaggs*. As expressed in *In re Mundy*, 363 B.R. 407, 412-413 (Bankr.M.D.Penn.2007), "[t]o interpret the common verb 'scheduled' as a reference to the proper noun 'Schedule' as used in the Bankruptcy Code is a grammatical exercise too complex and strenuous to be considered 'plain.'" Unlike Chapter 7 debtors, Chapter 13 debtors are not required to file a statement of intention. *See* 11 U.S.C. § 521(a)(2)(A). Unless Congress intended "scheduled as" to have a different meaning in Chapter 7 than it does in Chapter 13–which is not supported by the text or legislative history–it seems illogical to conclude that the phrase was intended to refer to the statement of intention. The argument that "scheduled as" refers to the bankruptcy schedules is equally illogical. Section 521(a)(B) and Federal Rule of Bankruptcy Procedure 1007 require only that the debtor file a "schedule of assets and liabilities." Significantly, there is no bankruptcy schedule that asks debtors to list "secured payments that are contractually due in each of the 60 months following the filing of the petition."[3]

Regardless of whether the phrase "scheduled as" was intended to have its common, dictionary meaning or to refer instead to a debtor's bankruptcy schedules, the crucial fact is that

---

[3]  While the Court otherwise agrees with *Nockerts'* reasoning, it disagrees with its suggestion that "scheduled as contractually due" may have a "materially different" meaning as applied in Chapter 13 than it does in Chapter 7. *See Nockerts*, 367 B.R. at 504. As discussed herein, while such a distinction seems logical, neither the statutory text nor the legislative history support it. For this same reason, the Court disagrees with the conclusion in *In re Van Bodegom Smith*, ---B.R.---, 2008 WL 613177 (Bankr.E.D.Wis.2008), that the contract in "scheduled as contractually due" in a Chapter 13 case is the plan, not the parties' underlying agreement. Again, while this reading of § 707(b)(2)(A)(iii) may render a more logical result, it is not supported by the provision's plain meaning or the relevant legislative history.

6

neither construction compels the conclusion that a debtor must continue to pay the amounts due under the contract in order to claim the expense.  If Congress intended for the expense deduction allowed under § 707(b)(2)(A)(iii) to be conditioned on continued payment of the expense, it presumably knew how to draft such a provision.  Reading that condition into the provision as it was drafted, however, strikes the Court as another "grammatical exercise too complex and strenuous to be considered 'plain.'" Based on the plain meaning of § 707(b)(2)(A)(iii), the Court must, therefore, conclude that Debtor was entitled to include his mortgage payment in calculating his disposable income for purposes of § 1325(b)(3).[4]

The next question for the Court is whether this construction of § 707(b)(2)(A)(iii) leads to a result that is absurd or inconsistent with Congressional intent.  One of the dominant goals of bankruptcy reform was to identify those debtors who can afford to repay all or some of their debts and to steer them into Chapter 13.  Congress's highly deliberate decision–as reflected in the legislative history for bankruptcy reform–to use an objective formula to make that determination over one that retained a degree of judicial discretion is significant.[5]  The legislative history specific

---

[4] The case law on this issue is developing at a brisk pace, but it currently appears that the majority of courts have reached the same conclusion. *See In re Burden*, 380 B.R. 194, 200 n.14 (Bankr.W.D.Mo.2007) (citing *In re Burmeister*, 378 B.R. 227 (Bankr.N.D.Ill.2007); *In re Chang*, 2007 WL 3034679 (Bankr.N.D.Cal.2007); *In re Hayes*, 376 B.R. 55 (Bankr.D.Mass.2007); *In re Kelvie*, 372 B.R. 56 (Bankr.D.Idaho 2007); *In re Wilkins*, 370 B.R. 815 (Bankr.C.D.Cal.2007); *In re Kogler*, 368 B.R. 785 (Bankr.W.D.Wis.2007); *In re Longo*, 364 B.R. 161 (Bankr.D.Conn.2007); *In re Mundy*, 363 B.R. 407 (Bankr.M.D.Pa.2007); *In re Sorrell*, 359 B.R. 167 (Bankr.S.D.Ohio 2007); *In re Hartwick*, 359 B.R. 16 (Bankr.D.N.H.2007); *In re Randle*, 358 B.R. 360 (Bankr.N.D.Ill.2007); *In re Walker*, 2006 WL 1314125 (Bankr.N.D.Ga.2006)).  *See also In re Bendetti*, 372 B.R. 90 (Bankr.D.S.Fla.2007), *In re Galyon*, 366 B.R. 164 (Bankr.W.D.Okla.2007); *In re Simmons*, 357 B.R. 480 (Bankr.N.D.Ohio 2006).

[5] For a comprehensive analysis of the history behind the bankruptcy reform movement that ultimately resulted in BAPCPA, see Susan Jensen, *A Legislative History of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 79 AM.BANKR.L.J. 485 (2005). For more perspective on means testing, the Court suggests the following:  Rafael I. Pardo, *Eliminating the Judicial Function in Consumer Bankruptcy*, 81 AM.BANKR.L.J. 471 (2007); Charles Jordan Tabb, *The Death of Consumer Bankruptcy in the United States?*, 18 BANKR.DEV.J. 1 (2001); and Jack F. Williams, *Distrust: The Rhetoric and Reality of*

7

to H.R. 833, introduced by Representative George Gekas (R-Pa.) as the Bankruptcy Reform Act of 1999 on February 24, 1999, is particularly noteworthy.[6]

During the bill's markup by the House Judiciary Committee, Representative Henry Hyde (R-Ill.), then Chairman of the Committee, offered several amendments to the means test, including one that sought to replace the Internal Revenue Service-defined expenses standards adopted by the means test with a "reasonably necessary expense" standard similar to Chapter 13's disposable income test in § 1325(b)(2). *See* Jensen, *supra* note 5, at 523. While the amendment passed by a vote of 13 to 11, it was later undone by another amendment proposed by Representative Lindsey Graham (R-S.C.) that was also approved by the Committee. That amendment, *inter alia*, restored the IRS standards to the means test. *Id*. at 523-24 (citing H.R.Rep. No. 106-123, at 98 (1999)).

When the House began its consideration of H.R. 833 on May 5, 1999, Chairman Hyde made the following comment in support of his amendment:

> I do not think it is a particularly Republican idea to advance the IRS living standards. Recently, Congress gave legislative expression to the need for flexibility in the application of the IRS expense allowances with the IRS to determine the appropriateness of applying the schedules to individual taxpayers. It would be particularly anomalous for this body to disregard the IRS Restructuring Act of 1998 and mandate an application of IRS expense allowances in bankruptcy cases that is more rigid and inflexible than what IRS itself does in the context of accepting compromises of tax obligations.
>
> * * * * *
>
> The bill wants to use the IRS standards. I want to replace them with the reasonably necessary standard, which is current law. The bill has over 75 creditor enhancements. And to say if my amendment passes is a deal breaker, that kills the bill, is ludicrous. There is so much in here for the creditors they ought to grab it and run.
>
> It just seems to be a little humanity, a little flexibility, a little reasonableness

___

*Means-Testing*, 7 Am. Bankr.Inst.L. Rev. 105 (1999).

[6]  The means test formula contained in H.R. 833, as passed by the House, is substantially similar to the one ultimately enacted into law by BAPCPA.

in working out the living standards, the rules by which you are going to live on while you are working out your Chapter 13 obligations, is appropriate.

145 Cong. Rec. H655-02 (May 5, 1999). Speaking out against the amendment, however, House

Majority Leader Richard Armey (R-Tex.) stated:

> This legislation as it comes to the floor has a good, acceptable, reasonable and I believe necessary objective standard. The Hyde-Conyers amendment would remove that and would leave us again to the vagaries of judgments in the courts and all that go with it.
>
> No, I think at this point we must practice legislative discipline. We must write the law as Congress intends the law. And we must give everybody who would enter the courtroom under the jurisdiction of the law a clear understanding of what the law is and what are the rules of the game and what are the compliances required going into it.
>
> I implore all of us to vote against this amendment, uphold clear, defined standards under the law. Let this legislation go forward as it does, as it is brought to the floor, as legislation that once again will connect freedom and responsibility in financial dealings as a message before all our families.
>
> We all teach these lessons to our children about accepting your responsibilities and fulfilling your responsibilities. Let the bankruptcy laws of this great land be a complement to the teachings we give our children and an encouragement to that, and let our children know the standards of compliance that are expected of them under the law. Let us not leave that to the whim of a judicial proceeding.

*Id*. Hyde's amendment was defeated by a vote of 184 to 238. *Id*.[7]

While application of the IRS standards is not at issue here, the above debate is still instructive as to how Congress intended the means test to be construed and applied. Congress deliberately and emphatically chose–after years of debate–a formulaic test over a more flexible, judicially governed standard to determine a debtor's ability to pay. Congress clearly sought to create a bright line test, and while the test itself may be flawed, the Court rejects the argument that a

---

[7] The Court notes that a similar campaign was waged in the Senate, unsuccessfully, to adopt a more flexible approach to means testing. *See* 146 Cong. Rec. S10771-01 (Oct. 19, 2000).

mechanical application of it generally, or of § 707(b)(2)(A)(iii) specifically, is somehow inconsistent with Congressional intent or leads to an absurd result.  *See Nockerts*, 357 B.R. at 503 ("While the means test may not function perfectly, . . . courts should not attempt to tamper with it to achieve a particular result in a particular case.").

For this same reason, the Court rejects the Trustee's insistence that § 1325(b)(3) should, despite its plain language, be applied flexibly.  Section 1325(b)(3) states that the expense component of disposable income "shall be determined in accordance with subparagraphs (A) and (B) of § 707(b)(2)."  The plain meaning of § 1325(b)(3) supports a  mechanical application of the means test in determining an above median income debtor's "disposable income" for purposes of § 1325(b)(1)(B).   The Trustee essentially argues, however, that § 1325(b)(3) cannot be read in isolation and that other language in § 1325(b)–namely the phrases "as of the effective date of the plan" in § 1325(b)(1) and "projected disposable income," "to be received during the applicable commitment period" and "to be expended" in § 1325(b)(1)(B)–suggest that the means test should be applied in a forward looking manner, taking into account any future changes in a debtor's income[8] and expenses.  In other words, per the Trustee's argument, the figure yielded by the means test serves merely as a guide or starting place for determining the expense component of disposable income.

Arguably, there is an appeal to this approach in that it will likely lead to a more realistic assessment of a debtor's current and future financial situation.  In the Court's opinion, however, that approach requires a flawed and tortured construction of the relevant statutory provisions.  It is a

---

[8]  While the issues are often related, the Court does not express any opinion on the other hotly debated issue presented by BAPCPA's changes to § 1325(b), i.e., whether "projected disposable income" is distinct from the concept of "disposable income."

cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, *if it can be prevented*, no clause, sentence, or word shall be superfluous, void, or insignificant. *TRW, Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 449, 151 L.Ed.2d 339 (2001) (citations omitted) (italics added). If Congress intended for courts to retain discretion under § 1325(b)(2)(B) in determining the expense component of disposable income, then the addition of § 1325(b)(3) to the statutory scheme was unnecessary. Under the old standard–and the one that still applies to below median income debtors–the Court was free to examine Schedules I and J and to challenge the amounts listed therein. The addition of § 1325(b)(3) effectively eliminated that discretion with respect to above median income debtors and to hold otherwise by using the means test as a mere starting place would essentially render § 1325(b)(3) meaningless.

The Court cannot conclude that Congress intended such a result. In interpreting a statute, a court must presume that a legislature says in a statute what it means and means in a statute what it says. In applying that rule of statutory construction here, the Court must conclude that the plain language of § 1325(b)(3)–even when read in conjunction with the rest of § 1325(b)–compels a mechanical application of the means test in determining the expense component of disposable income. Any other interpretation is simply too tortured to accept.

It should be noted that the addition of § 1325(b)(3) to the Code was first proposed in the 106th Congress following what appears to be informal conference negotiations between House and Senate members with respect to H.R. 2415. In support of the resulting conference report, H.R. Rep. No. 106-970 (2000) (Conf. Rep.), Senator Chuck Grassley (R-Iowa) submitted a provision-by-provision explanation of the legislation which indicated that the amendment was intended to provide an explicit definition of "disposable income" as used in § 1325(b)(2). *See* 146 Cong. Rec. S11683-

11

02 (Dec. 7, 2000) ("It is intended that there be a uniform, nationwide standard to determine disposable income used in chapter 13 cases, based upon means test calculations."). Significantly, there is nothing in the legislative history for § 1325(b)(3) to suggest that the conferees intended the means test to serve as a guide or starting place in determining the expense component of disposable income. *See id.*

While a mechanical application of the means test may lead to unfair or anomalous results, the Court cannot conclude that those results contravene legislative intent such that it should essentially rewrite the statute by adopting a more flexible approach. As previously explained, Congress clearly intended to limit judicial discretion, in both Chapter 7 and Chapter 13, through the application of the means test. Based on that understanding of the legislative history, the Court is hard pressed to insert judicial discretion into the Code where it was expressly removed. If the means test is not serving BAPCPA's overarching goal or is leading to unintended consequences, then the fix is legislative, not judicial. "'It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think . . . is the preferred result. *Id.* (citing *Lamie v. U.S. Trustee*, 540 U.S. 526, 542, 124 S.C.t 1023, 157 L.Ed.2d 1023 (2004) (quoting *United States v. Granderson*, 511 U.S. 39, 68, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994) (concurring opinion))); *see also Union Bank v. Wolas*, 502 U.S. 151, 158, 112 S.Ct. 527, 531, 112 S.Ct. 527 (1991) ("The fact that Congress may have not foreseen all of the consequences of a statutory enactment is not sufficient reason for refusing to give effect to its plain meaning.") (citing *Toibb v. Radloff*, 501 U.S. 157, 164, 111 S.Ct. 2197, 2201, 115 L.Ed.2d 145 (1991)).

### 2. Good Faith

Finally, the Court rejects the Trustee's argument that Debtor's Plan cannot be confirmed

because it does not satisfy § 1325(a)(3)'s "good faith" requirement.  The Court notes that the Debtor's Plan actually commits $250 per month, i.e., $250 more than is otherwise required under Debtor's Form B22C disposable income calculation.  Even if it did not, however, the Court would be unwilling to find bad faith based solely on the fact that Debtor is not committing more to fund a plan than is otherwise required under 1325(b)(2).  While at least one court supports the Trustee's position, *see In re Edmunds*, 350 B.R. 636, 648 (Bankr.D.S.C.2006), the prevailing rule of law since the initial adoption of § 1325(b) in 1984 is that the sufficiency of resources committed to unsecured creditors is governed by that more specific provision and is no longer a consideration in the good faith analysis under § 1325(a)(3).  *In re Mancl*, 381 B.R. 537, 542 (Bankr.W.D.Wis.2008) (citing *In re Smith*, 848 F.2d 813, 820 (7th Cir.1988); *In re Barr*, 341 B.R. 181, 183-185 (Bankr.M.D.N.C.2006) (collecting cases and history); *In re Alexander* 344 B.R. 742, 752 (Bankr.E.D.N.C.2006)).

Again, if Congress wanted to require debtors to commit something more than the disposable income revealed by the means test to fund their plan, then it presumably knew how to craft such a requirement.  The Court agrees with *Mancl's* conclusion that "it seems appropriate to leave questions concerning sufficiency of assets devoted to the plan to the scheme devised by Congress for that purpose.  Considering the sufficiency of the assets committed to the plan in the context of [the] good faith analysis would permit circumvention of the carefully crafted objective test established by the [BAPCPA] amendments." *Id.*  As suggested by *Mancl*, there would have to be additional evidence that the debtor somehow manipulated the disposable income calculation in order to fail the good faith standard based on an argument that the debtor is devoting insufficient income to the plan.

13

### C. <u>Conclusion</u>

Based on the foregoing, the Court overrules the Trustee's Objection to Confirmation and concludes that Debtor has met § 1325's "disposable income" and "good faith" requirements

###


Distribution:
Robert Cheeseborough
UST
Chapter 13 Trustee